IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:05CR294 |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| LYNN C. BOWERS, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the defendant Lynn C. Bower's (Bower)[1] Motion to Suppress (Filing No. 26). The defendant is charged with Francisco Robles (Robles) in the Indictment with conspiracy to distribute and possess with intent to distribute more than 500 grams of a mixture containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1). **See** Filing No. 1. The charge stems from Bower's contact with Omaha Police Department (OPD) officers at a residence where Bower was a guest. Bower seeks to suppress all evidence seized from his person after his detention, pat down search and arrest on May 4, 2005. Bower contends he was illegally seized and searched.

The court held an evidentiary hearing for the motion to suppress on December 14, 2005. At the hearing, the court heard the testimony of OPD officers Greg Gonzalez (Sergeant Gonzalez), Pamela R. Heidzig (Officer Heidzig), Robert Branch Jr. (Officer Branch) and Mark Lang (Officer Lang), and the defendant Bower. No exhibits were received into evidence. A transcript (TR.) was prepared and filed in this matter on December 20, 2005. **See** Filing No. 38. The defendant filed a brief (Filing No. 27). The government filed a brief (Filing No. 32) in opposition to the motion. No post-hearing briefs were filed.

**FINDINGS OF FACT**

Sergeant Gonzalez is currently assigned to the night shift narcotics unit (TR. 4). In April and May of 2005, Sergeant Gonzalez and other officers were conducting a narcotics investigation and developed information that Bower may be involved in the distribution of

---

[1]The Indictment and computer docket information in this matter have Lynn Bower's name incorrectly spelled as Bowers. However, the court will refer to the correct spelling in this report and recommendation.

methamphetamine (TR. 5, 26). The officers were familiar with the name Jennifer Lovings (Lovings) and her involvement in distributing methamphetamine (TR. 5). Specifically, Lovings sold one ounce of methamphetamine to an undercover officer (TR. 5, 26). The officers were actively searching for Lovings on May 4, 2005 (TR. 7). A reliable confidential informant told officers that Lovings knew officers were looking for her and she was carrying a firearm in her purse (TR. 12). Additionally, officers learned Lovings was using the alias Jamie (TR. 29). The officers also learned, during interviews related to the investigation, that Lovings and Bower had a relationship and may be living together (TR. 6, 26).

On May 4, 2005, Sergeant Gonzalez continued the narcotics investigation related to Bower by going to the residence of a suspected co-conspirator, Robles (TR. 6). At Robles's residence the officers arrested Michael Landon for possession of methamphetamine (TR. 7). After Michael Landon's arrest, he gave information about Bower including a 42nd Street address where Bower was (TR. 7). The residence on 42nd Street was also Michael Landon's residence (TR. 7). Michael Landon stated that at 6:00 p.m. Bower and a woman who he believed to be Lovings were at the residence with Michael Landon's wife, Mendy Hegge[2], and their children (TR. 8, 27). Although officers did not have prior information that Mendy Hegge was involved in the distribution of narcotics, they discovered she did have an outstanding felony warrant on file (TR. 8). Michael Landon also told officers that Bower and Lovings were driving a newer model blue Ford Explorer (TR. 9).

The officers set up surveillance at the 42nd Street residence to watch for Bower or Lovings (TR. 8, 26-27). The officers observed a blue Ford Explorer near the residence (TR. 9). The officers conducted surveillance from approximately 6:45 p.m. until approximately 9:40 p.m. (TR. 9). The officers had not seen anyone coming or going during that time period (TR. 9). Sergeant Gonzalez decided to approach the house and attempt to get consent to search the residence for Bower and Lovings (TR. 9-10). Sergeant Gonzalez testified the officers were concerned about Lovings having a firearm and took additional time to prepare and do research before approaching Lovings (TR. 13). Sergeant Gonzalez also took into consideration that children may be present inside the residence (TR. 13-14).

---

[2]Mendy Hegge is also known as Mendy Landon (TR. 8).

2

Officers Branch and Heidzig approached the back door and knocked while other officers watched the house (TR. 10, 28, 45). No one answered the door (TR. 28). The officers observed two young girls in the kitchen through a window (TR. 28). Officer Heidzig spoke to the girls, who stated their mother was in the basement with someone named Jamie (TR. 28, 46). Officer Heidzig asked the girls to get their mother and one went into the basement and returned with Mendy Hegge (TR. 28). Mendy Hegge opened the screen door (TR. 29). However, when the officers identified themselves Mendy Hegge attempted to close the door and walk away (TR. 29). The officers grabbed her by the arm and placed her under arrest (TR. 11, 15, 29, 46).

The officers conducted a protective sweep of the residence and located Bower and Lovings in the basement (TR. 11). Officer Heidzig described the protective sweep as when the officers determine whether there are other persons in the area in order to ensure officer safety (TR. 40). Bower and Lovings were handcuffed and brought upstairs to the kitchen within two minutes (TR. 11, 16, 22, 31, 37). Officer Heidzig completed the protective sweep of the basement after Officer James Quaites (Officer Quaites) removed Bower and Lovings (TR. 31). Officer Heidzig observed a scale and a methamphetamine pipe on a dresser and a wire basket containing several small Ziploc baggies near the bed (TR. 32).

Officer Branch stayed with Mendy Hegge, Lovings and Bower when they were brought to the kitchen (TR. 47). After making sure the three were separated, Officer Branch conducted a pat-down of Bower (TR. 47). Officer Branch testified he wanted to make sure the three detainees could not pass contraband or weapons between them (TR. 48). Officer Branch testified he conducted the pat-down of Bower for officer safety (TR. 48). The pat-down occurred approximately five minutes after the officers entered the residence, but contemporaneously with Officer Branch taking custody of Bower (TR. 48, 50). Officer Branch did not ask for consent to conduct the pat-down (TR. 53). Officer Branch felt a small pocketknife in Bower's right front jean pocket (TR. 48). Officer Branch testified that based on his experience it was readily apparent the object was a pocketknife (TR. 48). Officer Branch removed the pocketknife and noticed a small bulge in the coin pocket area about the right jean pocket (TR. 49). The bulge was approximately the size of a quarter in diameter, yet soft and pliable (TR. 49). Officer Branch suspected the object

was narcotics based on his experience and training as a police officer (TR. 49). Specifically, Officer Branch testified he has made numerous arrests of individuals who hide narcotics in their coin pockets (TR. 49). Officer Branch removed the object, which was a pinkish-colored plastic Ziploc bag containing suspected methamphetamine (TR. 49). Officer Branch then placed Bower under arrest (TR. 50). No other officer had spoken to Bower in the kitchen between Bower's arrival in the kitchen and the pat-down (TR. 50). Officer Branch did not ask Bower for identification (TR. 52).

Officer Heidzig took Lovings aside and placed Lovings under arrest (TR. 11, 31-32). Lovings gave consent to search and said "everything was hers" (TR. 32-33). Officer Heidzig returned Lovings to the kitchen and spoke to Bower (TR. 33). Officer Heidzig took Bower from the kitchen to a bathroom area (TR. 41). Officer Heidzig told Bower about the investigation and requested his consent to search the residence (TR. 33). Bower said he did not live there and could not give consent to search (TR. 33). Bower admitted he stayed at the residence occasionally and some clothes there, which Officer Heidzig had seen (TR. 33-34). Approximately one hour after the officers' arrival, Officer Quaites spoke to Bower about the Ford Explorer and car titles, which Bower had in his pocket (TR. 23).

Bower remembered the timing of events differently. Bower testified he remembered sitting on the kitchen floor and being helped up to speak with Officer Heidzig before the pat-down (TR. 59). Bower recalled having his pockets searched for identification and car titles before the discovery of methamphetamine (TR. 60-61). Bower thought it had been about an hour between the initial entry by officers into the residence and the discovery of methamphetamine on him (TR. 61-62). Bower testified there were two officers involved in the search of his person, but they looked alike and he did not know their names (TR. 72-75). Bower described the officer who asked him about the car titles as "dressed in black, short, hair, medium build, white" (TR. 74). Bower testified he was a heavy user of methamphetamine, "a teener a day," and had probably used methamphetamine on that day (TR. 67). Bower did not remember from whom he received the methamphetamine found in his pocket (TR. 69).

Officer Lang testified that in May of 2005 he was assigned to the narcotics unit and worked with Sergeant Gonzalez, and Officers Heidzig, Hunter, Quaites and Branch (TR.

4

78).  Officer Lang has known Officer Quaites since 1991 when the two of them went into the narcotics unit (TR. 78).  Officer Lang described Officer Quaites as a black male, age 40, six foot two and 190 pounds with a muscular build, short slightly receding hair and a thin mustache (TR. 78).  Officer Lang described Officer Branch as of Puerto Rican descent, with short black hair flipped up in the front and five foot ten and 175 pounds (TR. 79).  Officer Lang has worked with Officer Branch for about one and one-half years, but has never known anyone to confuse Officer Branch with Officer Quaites (TR. 79).

## LEGAL ANALYSIS

The defendant argues all evidence obtained from him on May 4, 2005, should be suppressed because he was subjected to an unlawful search.  Bower contends he was searched without consent approximately one hour after he was placed in handcuffs and secured on the floor in the kitchen.  Further, Bower argues there was no justification for a pat-down and officers emptied his pockets of documents before finding the methamphetamine.

In determining whether the officers had a basis for initiating the pat-down, the court must evaluate "whether the officer was rightfully in the presence of the party frisked so as to be endangered if that person was armed, and whether the officer had a sufficient degree of suspicion that the party to be frisked was armed and dangerous."  **United States v. Clay**, 640 F.2d 157, 159 (8th Cir. 1981) (**citing Brown v. Texas**, 443 U.S. 45, 50-53 (1979)).  The Supreme Court in **Michigan v. Summers**, 452 U.S. 692 (1981), held that police officers, executing a valid warrant to search a house, properly detained a resident of the house.  In **Summers**, the intrusiveness of detaining an occupant of the premises being searched was outweighed by the law enforcement interests in: (1) preventing flight; (2) minimizing the risk of harm to the officers; and (3) conducting an orderly search.  **United States v. Reinholz**, 245 F.3d 765, 777-78 (8th Cir. 2001) (**citing Summers**, 452 U.S. at 701-03).  The Eighth Circuit, among others, has applied the **Summers** rule and rationale to consensual searches.  **United States v. Hernandez-Hernandez**, 327 F.3d 703, 706 (8th Cir. 2003); **see United States v. Enslin**, 315 F.3d 1205, 1213 n.31 (9th Cir. 2003).  While Bower does not dispute the initial detention was justified, he contends the length and

5

manner of the detention renders the subsequent pat-down unjustified.  However, the basis and manner of the detention is relevant to the totality of the circumstances.

"When determining whether a police officer had reasonable suspicion of criminal activity, we must view the totality of the circumstances 'as understood by those versed in the field of law enforcement.'"  **Gray**, 213 F.3d at 1000 (**citing *United States v. Cortez***, 449 U.S. 411, 418 (1981)).  A pat-down is constitutionally reasonable if the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous."  ***Terry v. Ohio***, 392 U.S. 1, 30 (1968); **see *United States v. Gray***, 213 F.3d 998, 1000 (8th Cir. 2000); ***United States v. Davis***, 202 F.3d 1060, 1061 (8th Cir. 2000).  In the alternative, consent to a pat-down search obviates the need for a warrant or reasonable suspicion.  ***United States v. Sturgis***, 238 F.3d 956, 959 (8th Cir. 2001).  Bower did not consent to the search of his person.

In order to determine whether facts and circumstances surrounding a ***Terry*** search and seizure give rise to reasonable suspicion, the totality of the circumstances--the whole picture--must be taken into account.

> While the "purpose of a pat-down search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence," and while the search must therefore "be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby," officers may lawfully seize contraband they incidentally discover in "plain touch" during a ***Terry*** frisk.

***United States v. Bustos-Torres***, 396 F.3d 935, 943-44 (8th Cir. 2005) (**quoting *Minnesota v. Dickerson***, 508 U.S. 366, 373 (1993)).  "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."  ***Ybarra v. Illinois***, 444 U.S. 85, 91 (1979); **see *United States v. Flett***, 806 F.2d 823, 827 (8th Cir. 1986) (companions of arrestee in immediate vicinity are not automatically subject to pat-down search); **see also *United States v. Menard***, 95 F.3d 9, 11 (8th Cir. 1996) (same).  Finally, "if an officer has arrested the individual, the officer may search the individual's person incident to that arrest and may reach into his pockets.  A search incident to arrest is justified by the concern for officer

safety and the need to collect evidence of the offense." **United States v. Pratt**, 355 F.3d 1119, 1121-22 (8th Cir. 2004) (**citing *United States v. Robinson***, 414 U.S. 218, 234, 226, 236 (1973)).

To the extent the legal analysis is dependant on a credibility determination, the court finds Officer Branch's testimony more credible and reliable than the testimony of Bower. This determination is made based upon each of the witnesses' demeanor during the hearing, intelligence, memory, motives, general reasonableness and consistency with other testimony. In this case, officers had been conducting an investigation over time which revealed Bower was likely involved in the illegal trafficking of methamphetamine. The officers were looking for Lovings in connection with selling methamphetamine to and undercover officer. Lovings was believed to be hiding from police and to be carrying a firearm. During the arrest of another for possession of methamphetamine, the officers obtained information Bower and his paramour, Lovings, were at the residence of an individual with a felony warrant. There were children present in the residence. After officers entered the residence they found Bower and Lovings in the basement. The pair were brought upstairs and turned over to the custody of a single officer while other officers conducted a consent search of the residence. Items associated with drug trafficking and Bower's possessions were located in basement area of the residence. Under the totality of the circumstances, reasonable suspicion of criminal activity existed and that the persons with whom the officers were dealing may be armed and presently dangerous. Bower was not merely in close proximity to others for whom probable cause for arrest existed. Although, the two other adults in the residents were sought by officers and arrested, independent justification existed for the pat-down of Bower. Therefore, Bower's motion to suppress should be denied.

In any event, the court's determination does not change if the time line given by Bower is taken as true because the delay in conducting a pat-down does not, by itself, eliminate the justification for a pat-down search. In ***Menard***, an officer stopped a vehicle for a traffic violation at 2:00 a.m. and recognized one of the occupants as a drug trafficker. ***Menard***, 95 F.3d at 11. The officer obtained permission to search the vehicle. ***Id.*** The lone officer did not pat down the occupants immediately upon their exit from the vehicle,

but waited until a second officer arrived.  *Id.*  Although the officer could have reasonably conducted the pat downs immediately, the failure to do so does not evidence a lack of concern for safety or possibility of harm.  *Id.*  The court declining to find the delay to frisk confirmed a lack of particularized suspicion.  *Id.*  The *Menard* court noted the relevant inquiry does not focus on whether the officer felt scared, but whether under the totality of the circumstances the frisk was justified.  *Id.*  In this matter, the circumstances justifying the pat-down search of Bower did not dissipate, if there was a delay between the Bower's initial detention and the pat-down search.  Therefore, the court will recommend Bower's motion to suppress be denied in its entirety.  Upon consideration,

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

Lynn C. Bower's Motion to Suppress (Filing No. 26) be denied.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to timely object may constitute a waiver of any objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 3rd day of February, 2006.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge